[Crim. No. 345.  Third Appellate District.—September 9, 1916.]

THE PEOPLE, Respondent, v. W. A. HOWARD, True Name, WALTER H. ALLEN, Appellant.

CRIMINAL LAW—EMBEZZLEMENT—LARCENY.—If one honestly receives goods upon trust, and afterward fraudulently converts them to his own use, he is guilty of embezzlement; but if he obtains possession fraudulently, with intent to convert the same to his own use, and the owner does not part with the title, the offense is larceny.

ID.—WRONGFUL TAKING OF MONEY BY WIFE—HUSBAND AS AIDER AND ABETTOR—EVIDENCE—UNWARRANTED CONVICTION OF GRAND LAR-

CENY.—The conviction of a married man of the crime of grand
larceny on the theory that he aided and abetted his wife in the
wrongful taking of money by her, cannot be sustained, in the
absence of any evidence showing that the taking of the money was
the result of a fraudulent and felonious design of the defendant
and his wife conceived before she obtained employment in the com-
mercial college from which the money was taken, and it is shown
by the evidence presented that the money came into her control
and care while employed in such college as a stenographer, and that
among the duties assigned to her was that of selling small articles
of merchandise, receiving the money therefor, and depositing the
same in the cash register, to which she was given free access to
make change and *permission* to handle the money therein.

ID.—STATEMENT OF DIFFERENT OFFENSES—OMISSION TO CONCLUDE EACH
COUNT WITH PHRASE "CONTRARY TO FORM OF STATUTE"—SUFFI-
CIENCY OF INFORMATION.—An information in three counts, each
stating a different offense, is not prejudicial to the defendant, be-
cause of the omission to conclude each count with the statement
that the commission of the offense was "contrary to the form,
force and effect of the statute in such case made and provided,
and against the peace and dignity of the people of the state," etc.,
where the information is ended with such statement.

ID.—DIFFERENT OFFENSES—NUMBER OF PEREMPTORY CHALLENGES.—
Under an information charging more than one offense, the defend-
ant is entitled to but ten peremptory challenges in all, and not
ten as to each offense.

ID.—CHARGE OF DIFFERENT OFFENSES—ELECTION NOT REQUIRED.—
Under an information charging more than one offense, the people
are not required to make an election, before offering proof, upon
which count they intend to rely.

APPEAL from a judgment of the Superior Court of San
Joaquin County, and from an order denying a new trial.
C. W. Norton, Judge.

The facts are stated in the opinion of the court.

Lynch & Cross, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Dep-
uty Attorney-General, for Respondent.

HART, J.—The defendant was convicted of the crime of
grand larceny, and appeals from the judgment of conviction
and the order denying his motion for a new trial.

The information is in three counts, each stating a different
offense, viz.: The first charging the larceny of $305 in money,

the second the embezzlement of said sum, and the third the receiving of said money knowing it to have been previously stolen.

The attack upon the verdict is upon numerous grounds, which, generally stated, are that the court erred in overruling the demurrer to the information, in disallowing certain *voir dire* questions by the defendant to a certain juror, in denying the challenge by the defendant of a certain venireman upon the ground of actual bias, in refusing to require the people to make an election of the particular count of the several set out in the information upon which they intended to rely, in refusing to allow the defendant thirty peremptory challenges, the theory being that he was entitled to ten such challenges upon each of the offenses stated in the information, in its rulings upon questions involving the legal propriety of the admissibility of certain evidence, and in disallowing certain instructions preferred by the accused. It is further insisted that, if the defendant was guilty of any crime whatsoever, it was not that of grand larceny, of which the jury convicted him, but that of embezzlement. This last point necessarily involves, and its solution depends upon, the question whether the evidence supports the verdict.

Under the several heads above specified, many specific objections to the legal soundness of the result reached at the trial are here interposed and argued in the briefs. Such of these as we deem entitled to special notice and review we shall consider.

The facts, as gleaned from the evidence, may be summarized as follows: In the early part of the month of August, 1915, the defendant and his wife arrived at the city of Stockton and, under the name of Howard, took rooms at a house known as the "Adams Apartments." They were strangers in Stockton, and at said apartments represented themselves as being husband and wife. A few days thereafter they moved to a rooming-house in said city, known as the "McPhee Apartments," where they remained until their departure from Stockton, on the thirtieth day of said month of August. While stopping at the last-named apartments, and about the middle of the month named, "Mrs. Howard" secured employment as a stenographer with a commercial college in said city known as the Western School of Commerce. Said college was incorporated, and at the time of the

employment of Mrs. Howard, one John R. Humphreys was president of the corporation and principal of the school, and as such was authorized to employ such assistants as were found necessary to aid in carrying on the business of the institution. When she applied for employment she represented to Humphreys that her name was "Miss Helen Burns," and under that name she accepted the employment. "Mrs. Howard" worked at a desk located in the office of the secretary of the corporation. At about the hour of 12 o'clock, noon, on the thirtieth day of August, 1915, she left the office of the secretary and did not return. A short time after her departure, and after the time at which she should have returned to the office and resume the discharge of her duties, it was discovered upon investigation that the sum of $305 was missing from the cash register which was kept in the office of the secretary.

It transpired that, on the day last mentioned, Howard and his wife met at a point on one of the streets of Stockton and hired a taxi-cab, in which they were driven to Lodi, a distance of a few miles north of Stockton. At Lodi, Mrs. Howard purchased some wearing apparel at one of the stores in said town and Howard, at another store, bought a suit of clothes and a suit case. The clothes worn by him to Lodi he left at the store at which he purchased and donned the new suit. Howard also went to the bank at Lodi and exchanged some gold for paper money. Within a brief time thereafter, Howard and his wife at Lodi boarded a northbound train and went to Sacramento, at which place they bought tickets for the east, and on the said thirtieth day of August together left for the east. They were later arrested in the east and returned to Stockton. While in the east and before their arrest, the defendant, whose true name is Walter Howard Allen, gave his name and registered at hotels variously as "Taylor," "Churchill" and "Howard."

There is, in the record, testimony from which the jury could justly have inferred, as perhaps they did conclude, that the defendant down to the day upon which he with his wife left Stockton, was wholly without financial means, with the exception of five dollars in gold from which he paid for some drinks at a bar for himself and one R. J. Richardson, who, with his wife, also occupied rooms at the McPhee Apart-

ments, and to whom the defendant explained that he had received the money from his wife.

It further appears that Mrs. Howard, a day or two before the date of her departure from Stockton, took to her apartments a bank-book which was the property of the institution by which she was then employed, and that while she and the defendant were eating their lunch on that occasion, Mrs. Richardson, wife of the party of that name above referred to, came into their apartments, whereupon the defendant picked up the bank-book from the table where it had been placed by Mrs. Howard, and, addressing Mrs. Richardson, remarked: "Look what my little girl has banked to-day. Three hundred and sixteen dollars! Wouldn't that make a fine trip?" To this Mrs. Howard rejoined: "No, the straight and narrow path for me."

It was further shown that, on two several occasions, Mrs. Howard asked the secretary of the corporation, J. W. Rousch, whether she "should take money received at the school to the bank," and the secretary replied that she should not.

It was shown, and, in fact, the defendant admitted, that, within an hour before he and his wife left Stockton for Lodi, he held a conversation with his wife through the telephone from a saloon which he had been in the habit of frequenting while in Stockton, that, within a brief time thereafter his wife called and talked with him over the same telephone, and that thereupon the defendant left the saloon, met his wife, and immediately left with her for Lodi in the manner above described.

Certain statements made to the sheriff by the defendant after his arrest were received in evidence at the behest of the people. Thus it was shown that, among other declarations, the defendant said that he could not be convicted of any offense which might be charged against him without the testimony of his wife disclosing that he was implicated in the crime, and that his wife could not testify against him without his consent. He further asseverated his innocence of any connection with the commission of the crime by his wife, and declared that he had no knowledge before she took the money that she intended to do so. He admitted, however, that, when he met his wife just before leaving Stockton, she told him that she had taken the money, and that he then said to her that she had better "beat it," by which he meant

to say that it was better for her to get away from Stockton. He also explained that he registered at hotels in the east under fictitious names only because he desired to protect his wife and so prevent her apprehension, and not because he was himself conscious of having been guilty of committing any wrong in connection with the transaction. These declarations were, as before stated, proved or brought into the record by the people as having been extrajudicially made by the accused.

Thus we have reproduced in substance all the testimony introduced by the people bearing upon the defendant's connection with the crime committed by his wife.

It will not, of course, be disputed that, since the defendant himself did not actually take the money, it must be made to appear, before a conviction of larceny can stand against him, that the taking of the money by his wife constituted larceny. In other words, since the defendant can only be made out a principal in the crime charged by showing that he aided and abetted in the commission thereof (Pen. Code, sec. 971), he obviously cannot be convicted of larceny if the crime in the commission of which he aided and abetted, is that of embezzlement or some other offense than that of larceny.

The distinction between embezzlement, in a general sense, and larceny is thus stated in *People* v. *Tomlinson,* 102 Cal. 19, [36 Pac. 506] : ". . . If one honestly receives goods upon trust, and afterward fraudulently converts them to his own use, he is guilty of embezzlement; . . . if he obtains possession fraudulently, with intent to convert the same to his own use, and the owner does not part with the title, the offense is larceny."

Section 503 of the Penal Code defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been intrusted."

Section 508 of the same code reads: "Every clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment as such clerk, agent, or servant, is guilty of embezzlement."

Thus it will be observed that, to constitute the act of taking the money by the wife of the defendant larceny, it must be true and shown that the possession of said money was

obtained by her fraudulently or by means of some trick, con-
spiracy, or artifice, with the felonious intent of converting
the same to her own use. If, for illustration, it were clear
that Mrs. Howard (or Allen) had designedly and fraudu-
lently and for the purpose and with the felonious intent of
taking the money from the possession of the school of com-
merce, to be converted by her to her own use, sought employ-
ment with said school so as to place herself in a position in
which she could the more readily execute her evil or felo-
nious design and intent, then, she having under such circum-
stances taken the money, the crime would be larceny. (*Peo-
ple* v. *Rae,* 66 Cal. 423, 424, [56 Am. Rep. 102, 6 Pac. 1].)
On the other hand, if honestly she received possession of the
money on trust (*People* v. *Tomlinson,* 102 Cal. 19, [36 Pac.
506]), or if, as a duly employed clerk, agent, or servant of
the school, the money came "into her control or care by vir-
tue of her employment as such clerk, agent or servant," and
she fraudulently appropriated such money to her own use,
or secreted it with the intention of appropriating it to her
own use (Pen. Code, sec. 508), then she is guilty of embez-
zlement and not of larceny of the money. (*People* v. *Tom-
linson,* 102 Cal. 19, [36 Pac. 506].)

There are, it will be observed from the testimony pre-
sented by the people and thus far and above stated herein,
but two circumstances, aside from the fact of flight, which
tend in any measure to indicate that the accused aided and
abetted his wife in the commission of the felonious taking of
the money, viz.: 1. The remark of the defendant that the
amount of money shown by the bank-book to be on deposit
in a bank in the name of the school would "make a fine
trip." 2. The fact of the telephonic communications be-
tween the defendant and his wife while he was at the saloon
referred to just prior to the time at which he met her and
the two together left for Lodi. Whether these circum-
stances, together with that of flight, were sufficient to war-
rant a substantial inference that the defendant aided or
abetted or advised his wife to take the money, was, of course,
a question for the jury. And, conceding that thus the jury
might have justly concluded that he did so aid and abet his
wife in whatever crime her act constituted, still it will cer-
tainly not be contended that those circumstances showed
that, prior to her employment by the school of commerce,

there was a conspiracy or understanding between them that she was to seek and, if possible, secure such employment for the purpose and with the design and intent of making available to her an opportunity for the felonious asportation of the money of said school. In other words, it will not be seriously claimed that those circumstances, whatever may be their probative value in some other direction, show that the taking of the money was the result of a fraudulent and felonious design of the defendant and his wife conceived before she secured employment with the school. The fact of flight, and the assumption by him of fictitious names after he left California, are the strongest circumstances which were presented against him. Both these facts, when proved, constitute, it is to be conceded, strong incriminatory circumstances against an accused. But it will not be claimed that either can have the effect of disclosing, or of serving as the test for determining, the legal character or nature of the crime committed. In this case it cannot, of course, be determined from those circumstances when the design to commit the crime was formed—whether before Mrs. Howard went to work for the school or after she entered upon the discharge of her duties as an employee of the school. Thus it is clear that whether the crime committed by the wife was larceny or embezzlement does not appear from the testimony thus far considered. We are, therefore, required to examine and consider the testimony disclosing the circumstances attending her employment and showing the scope and extent of her duties and authority as an employee of the school to determine the legal character of the crime committed by her. Upon this question, the only testimony brought into the case was that given by the witness Humphreys, principal of the school and president of the corporation into which the institution had been organized.

It will be recalled that Humphreys testified that he, as president of the corporation, conducted the negotiations culminating in the employment of Mrs. Allen. He further testified that he employed her as a stenographer; that the desk at which she performed her duties was located in the office of the secretary of the corporation; that the corporation kept a stock of "petty merchandise," such as pencils, paper, etc.; that among the duties assigned to Mrs. Howard was that of selling the articles of merchandise mentioned, to receive the

money therefor, and to deposit the same in the cash register, which was kept in the secretary's office; that she, by reason of the authority so conferred on and exercised by her, had "free access to the cash, and made change, sold the merchandise, and had general authority that a stenographer has in an office." "Q. She sold merchandise? A. Yes, sir; had free access to the drawer. Q. Received money from the sale of merchandise? A. Certainly, just as any other employee would. Q. You state that this money that you allege was embezzled from the Western School of Commerce was in the till—the cash register? A. Yes, sir. I do not know that all the money she took was in the cash register because there was other money in the room which was not in the cash register. Q. How much money was in the room at that time? . . . A. Approximately thirteen to fifteen hundred dollars, . . . a large portion of which was in the cash register."

No doubt exists in our minds that the foregoing testimony clearly shows that Mrs. Allen, while in the service of the school, was a clerk or servant of the corporation within the meaning of section 508 of the Penal Code, and, that the money which she is charged to have taken from the corporation came into her "control and care by virtue of her employment as such clerk or servant," there can be no possible room for doubt, in our opinion. She was, by virtue of her employment, authorized to receive money in exchange for goods sold, and to make change from the moneys in the cash register when necessary. In short, as Humphreys testified, she had free access to the cash register, with authority to handle the money deposited therein for any purpose within the scope of her authority as a clerk or employee. The money in the cash register was, to the extent of her authority, and the use to which it was necessary for her to put it as such employee, as clearly and as much intrusted to her control and care as the money in a bank is intrusted to the control and care of the cashier, or the money received into the cash till of a general store is intrusted to the control and care of the sales clerks in such store. If a sales clerk in an establishment dealing in general merchandise, during working hours and while actually performing his duties as such clerk, were to fraudulently take and convert to his own use money from the till, to which he had authorized access, and

in which it was his duty to place money received for mer- · chandise and from which it was within the scope of his authority to take money for the purpose of making change, no one would be found to doubt for a moment that his act would constitute embezzlement. The case stated is in no respect different from the present case under the facts as proved at the trial and above stated in substance. Emphasis is, however, placed upon the statement of the witness, Humphreys, in one part of his testimony, that Mrs. Howard was not given *authority* but merely *permission* to handle the money in the cash register. But we cannot perceive that that statement in any way shows a qualification of the authority of Mrs. Howard, under her employment, to receive the money for goods sold and to make change, if required, out of the moneys in the register. "Permission" to do an act is "authority" to do it. Every agent is authorized to do whatever the terms of his agency permit him to do and, stating the proposition conversely, is permitted to perform any act within his authority as agent. Moreover, the contractual relation between the principal and the agent must be determined by the facts upon which the relation is founded, and not by the conclusion of the one or the other of the parties from the facts. Under the testimony of Humphreys and in view of the fact that, as above shown, there is no proof whatever showing that the act of Mrs. Howard in taking the money was the result of a conspiracy between her and the defendant conceived and planned before she entered upon the discharge of her duties under her employment with the corporation, it is clear to us that the crime which the evidence appears to sufficiently show was committed by Mrs. Howard was that of embezzlement, as defined by section 508 of the Penal Code. It therefore follows as a matter of law that there exists a variance between the charge of which the defendant was found guilty and the proof. In other words, the conviction of the defendant of grand larceny under the evidence presented by the record cannot be sustained, since, as we have pointed out, he cannot legally be adjudged guilty of an offense different from that in the commission of which he has aided and abetted.

The conclusion thus arrived at is, of course, decisive of the case, and, therefore, so far as is concerned the result so reached, it is wholly unnecessary to consider other points

made by the defendant. But, in view of a probable retrial of the case, we deem it proper to review some of those points.

There was no prejudicial error in the order overruling the demurrer to the information. The particular ground of objection to the information arises from the absence therefrom at the end of each count the conclusion, "contrary to the form, force and effect of the statute," etc. At the common law, in cases where several different offenses or different statements of the same offense were set up in different counts, and where in such cases the rule was disregarded and the form omitted as so required, the omission was held sufficient to vitiate the accusatory pleading. And there are some cases which hold that under the code system each count must be followed by the conclusion mentioned. In this case, after stating the different offenses, the information ends with said conclusion, and we think that this was sufficient. The conclusion referred to, although required by the statute (Pen. Code, secs. 809, 951), involves a conclusion of law and is a mere matter of form and not of substance. If an indictment or information states facts disclosing that a public offense has been committed, the statement that the commission of such offense is "contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the people of the state," etc., adds nothing to the force of the charge as made, and conveys no information which does not necessarily inhere in or proceed from the mere statement of the offense itself. Of course, we are not thus to be understood as holding that the form in which the legislature has declared that an indictment or information shall be molded need not be adhered to. To the contrary, we hold that the form as prescribed must or should be observed. What we have said relative to the proposition is only for the purpose of showing that the objection against the information here goes only to a matter of form, and that, since that pleading does end with the conclusion required by the statute, the effect of the omission to end each count with such conclusion, even if necessary in a strict view of the statute, could not, had he been convicted of the proper crime, justly be held to have affected or impinged upon the substantial rights of the accused, or in any degree deprived him of a full and fair trial on the charge of which he was so convicted. While section 4½ of article VI of the constitution

is not applicable to this proposition inasmuch as the cause must be reversed, still the views above expressed are in harmony with the spirit of that provision of our organic law, and is, moreover, in perfect harmony not only with the spirit but with the letter of section 960 of the Penal Code.

2. The contention that the defendant was entitled to exercise ten peremptory challenges on each of the counts, or thirty in all, is wholly destitute of merit.

The ultimate object of the law in authorizing the statement of different offenses in the same indictment or information is to prevent mistrials, and experience has demonstrated that this can in certain cases the better be accomplished by setting forth several different offenses of the same general class, thus so framing the accusatory pleading as to authorize, where the evidence justified it, a conviction of the accused of the precise crime which the evidence shows he has committed, it often being difficult to determine, until the facts are all brought out and have been presented in regular and concrete form, what particular crime of several belonging to the same general class has been committed. And, both in theory and in fact, it is only that particular offense, if any at all, which the evidence discloses that the accused has committed upon which he is to be tried or, in the last analysis, is tried; for, very clearly, he can, in contemplation of law, neither be tried upon, nor convicted under, all the counts. It follows that the accused was legally entitled to exercise the right to interpose but ten peremptory challenges.   (Pen. Code, sec. 1070.)

3. It was not necessary for the district attorney to make an election, before offering proof, of one particular count, of the three stated in the information, upon which he intended to rely for a conviction.   As we have already shown, it was the proper practice for the district attorney to prove the facts and then ask for a conviction of the accused of that offense of the several charged legally appropriate to the facts so proved.   Indeed, if, as the attorney for the accused contends is true, it was legally incumbent upon the people to make an election before any evidence was presented, the very primary purpose of section 954 of the Penal Code would be defeated.   There would in such case be no efficacy in charging different offenses.

31 Cal. App.—24

There are no other points to which special attention need be given.

For the reasons herein stated, the judgment and the order are reversed.

Ellison, J., *pro tem.*, and Chipman, J., concurred.